IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ELIZABETH COLGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.**  15-cv-306-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Elizabeth Colgan is before the Court, represented by counsel, seeking judicial review of the final agency decision denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for benefits on August 17, 2011, alleging disability beginning on June 1, 2005. (Tr. 17). After holding an evidentiary hearing, ALJ Karen Sayon denied the application in a written decision dated October 23, 20123. (Tr. 17-33).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

1

1. The ALJ improperly weighed the medical evidence.

2. The ALJ improperly assessed plaintiff's RFC.

### **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and

> ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** See also, **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled… If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of

performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See***, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)(citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))**.

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Sayon followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since her alleged onset date. She found plaintiff had severe impairments of fibromyalgia, degenerative disc disease of the lumbar and cervical spine, depression, anxiety, and obsessive compulsive disorder. (Tr. 19). The ALJ determined these impairments did not meet or equal a listed impairment. (Tr. 20).

The ALJ found plaintiff had the residual functional capacity to perform work at the light level with physical and mental limitations. (Tr. 22). Based on the testimony of a vocational expert (VE), the ALJ found plaintiff was unable to perform past work. However, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (Tr. 32-33).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born on May 26, 1969 and was thirty-five years old at her alleged onset date of June 1, 2005. (Tr. 199). She was five feet eight inches tall and weighed one hundred and seventy pounds. (Tr. 202). Plaintiff graduated from high school and completed pharmacy technician training. (Tr. 203). She previously worked as a bookkeeper for a roofing company, a clerk for a retail

store, a pharmacy technician at a prison, a secretary in a veterinarian's office, and a tutor in a writing center. (Tr. 203).

Plaintiff stated that depression, panic attacks, fibromyalgia, bulging discs, four fused vertebrae, severe allergies, and agoraphobia limited her ability to work. (Tr. 202). She took Abilify and Wellbutrin for depression; Adderall for fatigue; Advair and Nasacort for allergies; Bromocriptine for pre-diabetes; Clindamycin for acne; Estrogen for perimenopause; Flexeril and Vicoprofen for pain; and a thyroid medication. (Tr. 205).

Plaintiff completed a function report in September 2011 and updated portions of the report in January 2012. (Tr. 240-56, 270-90). She stated that she could not use her right hand, she could not regularly show up for work, and her panic attacks made her need to go home in order to feel safe. (Tr. 240, 270). On a good day, plaintiff stated that she bathes, takes her dogs out, occasionally does light housework, goes to her brother's house, or goes to a doctor's appointment. In the evenings, if the weather is nice and she is feeling well, she would sit outside with her dogs for less than an hour. (Tr. 241-42, 271-72). She commented that her depressive episodes can cause her to stay in bed all day so she does not bathe, change her clothing, or eat. (Tr. 241, 271).

Plaintiff stated that she typically ate leftovers or sandwiches and rarely made meals on her own. When plaintiff was able to do housework, she did some laundry, dusting, cleaned the toilets, and loaded the dishwasher. She could not vacuum, lift anything over five pounds, or frequently bend over. (Tr. 243, 273). She was able to drive but had panic attacks if she left the house

alone. (Tr. 244, 274). For fun, plaintiff read, worked puzzles, watched birds, completed crosswords, and watched television. (Tr. 245, 275).

She claimed to have difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using her hands, completing tasks, and concentrating. She could walk for about ten minutes before needing a ten minute rest. She could follow written instructions but had difficulty with spoken instructions. (Tr. 246, 277). Plaintiff explained that joint pain, right hand and right arm pain, neck and back pain, random flulike symptoms, depression, anxiety, agoraphobia, and panic attacks contributed to her difficulties in the workplace. (Tr. 247-48, 278-79). She had difficulty turning her head and with range of motion in her back after her surgeries. (Tr. 278). She listed several medications as the cause of side effects such as jumpiness, dry mouth, dry eyes, sleepiness, weight gain, decreased sex drive, and increased urination. (Tr. 251-52, 282-83). In January 2012, plaintiff added a report from an MRI that indicated she had a disc bulge and mild to moderate bilateral foraminal narrowing. (Tr. 287).

Plaintiff's husband completed a function report in September 2011. (Tr. 215-22). He lived in a house with plaintiff and had known her for seven years. Plaintiff's husband stated that allergies prevented her from performing jobs outside; her bad back and joints precluded active work or any jobs where excessive standing or sitting was necessary; her depression and anxiety caused high absenteeism as well as uncontrollable crying in the workplace; and simple typing or writing could cause her hands to go numb. (Tr. 215).

He stated that on a daily basis, plaintiff drank coffee, read, took medications, went to doctors' appointments, performed light cleaning, fed and watered the house pets, and ate. He stated that plaintiff could do a maximum of one load of laundry a day. Plaintiff's sleep was affected by her injuries and illnesses. (Tr. 216). Plaintiff's husband prepared most of the meals but about once a month plaintiff would cook noodles or soup on her own. It would take plaintiff an hour or two to perform household chores that would take a healthy person less than an hour. (Tr. 217). Plaintiff went to the store about once every other month for about an hour and she could not handle finances. (Tr. 218). He claimed plaintiff had trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands. (Tr. 220).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing on September 23, 2013. (Tr. 41-88). Plaintiff was forty-four years old and lived with her husband on a farm. (Tr. 47). She was five feet eight inches tall and weighed one hundred and fifty-five pounds. (Tr. 49). She used to have animals on the farm but had to slowly get rid of them due to her inability to care for them. (Tr. 48-49).

Plaintiff had a bachelor's degree in psychology with a minor in administration of justice from Southern Illinois University at Carbondale that she received in 1993. She went back to college from 2005 until 2007 and

studied English literature because she wanted to be a high school English teacher. (Tr. 50). She had good grades but eventually had to stop going to class because she could not carry her books, she had severe allergies that caused her to stay home, and she had a nervous breakdown due to stress. (Tr. 50-51). She had a driver's license but had difficulty checking her blind spots because she could fully turn her neck. (Tr. 49).

She and her husband took a trip to the Hoover Dam but her husband drove and they stopped once every half an hour to an hour for a break. (Tr. 66, 74-75). She was able to clean the toilets in her home and do laundry but could not sweep the floors or mop. (Tr. 78-79). She testified that she would sit in her brother's deer stand for forty-five minutes at a time a few times each summer. However, she no longer went to the stand after she recently fell from it. (Tr. 66, 82). She occasionally would visit with family and friends and she tried to go outside for at least ten minutes a day. (Tr. 64).

Plaintiff has several jobs on record. She worked part-time at a Pier One store for about three years. (Tr. 51) Her job there ended because she had high absenteeism and she was unable to perform tasks they needed like unloading trucks or putting things on shelves. After working at Pier One, she got a job at a veterinary clinic where she worked for about three months until she was fired because of her personality. She also worked at Southern Illinois University's writing clinic for three semesters. At the writing clinic, plaintiff would work two or three evenings a week and help students with grammar, formulating ideas, and writing papers. (Tr. 52). She worked part time at her brother's roofing

company for about three years. (Tr. 53). Plaintiff worked at a Lowe's home improvement store as a cashier and a manager for three years. (Tr. 53-54). She also worked at Walgreen's and at a prison as a pharmaceutical technician for several years. (Tr. 55-56).

Plaintiff stated that she had both physical and mental illnesses that made her unable to work. She testified that she had pain in her neck that would shoot down her right arm. This pain made her unable to use a calculator or write with a pen. (Tr. 57). She had severe headaches that turned into chronic migraines and eventually had surgery on her neck to alleviate the pain. (Tr. 57-58). She had pain in her lower back that would shoot down her legs and made her knees hurt. (Tr. 58). She had lower back surgery that did not provide relief and caused her pain to worsen. (Tr. 59).

Plaintiff testified that depression and anxiety affected every aspect of her life. Depression made it difficult for her to get out of bed in the morning and do normal day to day activities. (Tr. 60). Her anxiety caused her to have panic attacks if she was in a crowded room. (Tr. 68). She also had obsessive compulsive disorder (OCD) which made her focus on unimportant things instead of her assigned tasks at work. (Tr. 68-69). Plaintiff testified that she could use a computer only in short intervals because she could not do small repetitive things with her hands. (Tr. 69). She also stated she had difficulty concentrating for more than an hour due to her depression and anxiety. (Tr. 70).

A vocational expert (VE) also testified. (Tr. 83-89). The VE testified that plaintiff's past work included jobs that were classified as light in physical demand, medium as she performed them, and semi-skilled in nature. (Tr. 83).

The ALJ asked the VE a hypothetical where she was to assume a person with plaintiff's age and educational background and could perform light work and the person could not climb ladders, ropes, or scaffolds. (Tr. 84). The person could occasionally crouch, balance, crawl, kneel, stoop, climb ramps, and climb stairs. (Tr. 83-84). Additionally, due to mental impairments in concentration, persistence, or pace, the person could complete routine, repetitive tasks. The person would be limited to simple instructions, simple work related decisions, and no public interaction. (Tr. 85).

The VE testified that this person could perform jobs that exist in a significant number in the national economy. Examples of such jobs are merchandise marker, mailroom clerk, and housekeeping jobs. (Tr. 85). The VE testified that if the person missed more than one day of work per month, or was off task more than fifteen percent of the day, the person could not maintain competitive full-time employment. (Tr. 86).

### 3. Medical Evidence

Plaintiff has extensive medical records for her physical and mental ailments. The Court will begin with plaintiff's physical impairments. Plaintiff began receiving treatment for back pain from her primary care physician, Dr. Roger Jones, in October 2007. (Tr. 658). Her pain began in her lower back and traveled through her bilateral lower extremities. Dr. Jones recommended she

receive steroid injections to decrease her pain. (Tr. 658). In October 2009, plaintiff saw a chiropractor for pain in her neck, mid-back, low back, and left shoulder that radiated down her arm into her hand. (Tr. 429). She was diagnosed with brachial neuritis or radiculitis NOS, non-allopathic lesions of the cervical region, and myalgia and myositis unspecified. (Tr. 430).

In March 2010, plaintiff began seeing Neurosurgeon Sonjay Fonn for treatment of her back and neck. (Tr. 616-8). Plaintiff told Dr. Fonn that she had back and neck pain for eleven years with pain that radiated down her right arm. She reported headaches and that physical therapy in the past was helpful. (Tr. 617). Dr. Fonn ordered an MRI that indicated plaintiff had moderate central bulge of her C4/5 disc flattening the anterior contour of the thecal sac and minimal central bulge of the C5/6 and C6/7 disc without herniation. She also had minimal arthritic changes at L3/4 and L4/5 facets. (Tr. 624-26). In April 2010, plaintiff had a lumbar facet block and cervical epidural steroid injections. (Tr. 455-59).

Dr. Fonn administered cervical epidural injections in January and February of 2011. (Tr. 443, 447, 609). Plaintiff still reported pain and testing indicated decreased sensation in her neck and back. (Tr. 604, 606). In March 2011, Dr. Fonn performed microdiscectomies for decompression at C4/5, C5/6, and C6/7. (Tr. 435-36). She reported decreased pain as a result and did well after surgery. (Tr. 600). At a follow-up appointment in June 2011, plaintiff reported some symptoms in her right arm and minimal back pain. (Tr. 599). She was prescribed physical therapy and pain medications. (Tr. 598-99). In

August 2011, after an MRI revealed hypertrophy and foraminal narrowing, Dr. Fonn performed a lumbar epidural steroid injection and a lumbar facet block. (Tr. 598, 620, 867). In December 2011, an electromyogram revealed nerve irritation in the right C5/6 nerve distribution. (Tr. 290).

Plaintiff returned to Dr. Fonn several times in the beginning of 2012 and he administered three rounds of epidural shots in her lower back. (Tr. 860-65). In April 2012, Dr. Fonn performed a microdiscectomy at L4/5. (Tr. 845). Plaintiff did not demonstrate significant improvement and in July 2012 reported numbness in her legs. (Tr. 906). Plaintiff was referred to physical therapy where testing revealed decreased range of motion of the cervical and lumbar spine and reduced strength in the cervical and lumbar spinal regions. (Tr. 906). Plaintiff had twelve physical therapy appointments in 2012 but still reported difficulty standing, sitting, and walking. (Tr. 892-907).

In February 2013, plaintiff reported tenderness in her bilateral sacroiliac joints. (Tr. 935). Dr. Fonn examined Ms. Colgan in March 2013 and observed decreased sensation in the right C7 and C8 distributions as well as positive Spurling's sign[2], Tinel's test[3], cubital and radial tunnel signs, and bilateral sacroiliac joint tenderness. (Tr. 933). In March 2013, Dr. Fonn performed two sets of bilateral sacroiliac steroid injections. (Tr. 927, 931).

---

[2] A positive Spurling's sign, or Spurling's test, indicates probable nerve root pressure and demonstrates a need for further imaging studies.
http://onlinelibrary.wiley.com/doi/10.1111/j.1552-6569.2011.00644.x/abstract;jsessionid=8484C4C77B82D4F3B6C39BD8BDEE6E24.f03t01
[3] Tinel's test is used to diagnose carpal tunnel syndrome.
http://www.ncbi.nlm.nih.gov/pubmed/1461811

In August 2013, Dr. Fonn referred plaintiff for treatment with rheumatologist Dr. Amjad Roumany, M.D. (Tr. 1033-39). Dr. Roumany's examination revealed tenderness to palpation and diffuse myofascial tender points. He ordered further testing to be done but indicated he did not think plaintiff had a connective tissue disease or underlying inflammatory arthritis. (Tr. 1034).

Plaintiff's mental health treatment history began in October 2004 when she presented to Dr. Jones reporting anxiety. She was taking Buspar, Xanax, and Lexapro to help alleviate her symptoms. (Tr. 669). Plaintiff regularly saw Dr. Jones and complained on and off of depression and anxiety related symptoms. (Tr. 647-666). In May 2008, she reported to Dr. Jones that she had passive suicidal ideation. (Tr. 655).

In June 2008, plaintiff was hospitalized for a month after experiencing an onset of increasingly depressive symptoms. (Tr. 980-1014). At the hospital, plaintiff began receiving treatment from psychiatrist Simeon Grater, M.D., where he noted plaintiff's potential for suicide was moderate and he diagnosed plaintiff with major depressive disorder, severe. (Tr. 1009-10). Plaintiff attended several group and individual therapy sessions while hospitalized. (Tr. 980-1008). However, in August 2008, plaintiff attempted suicide and was again hospitalized. (Tr. 377-79).

In October 2008, plaintiff began to regularly see Dr. Grater. He diagnosed plaintiff with severe recurrent major depression and anxiety disorder and increased the dosage of her anti-anxiety medication. (Tr. 479-80). Dr. Grater

continued to treat plaintiff and regularly saw her until he retired from practice in May 2012. (Tr. 479-80, 481-82, 483-84, 485-86, 487-88, 489-90, 491-92, 493-95, 496-98, 499-501, 502-04, 505-07, 508-10, 511-13, 514-16, 517-18, 519-21, 522-25, 526-28, 529-31, 887). Dr. Grater frequently changed plaintiff's medications due to increased crying spells, angry outbursts, excessive worry, and severe anxiety and depression. (*Ex.*, Tr. 486, 489, 496-98, 511-13, 526-28).

In August 2011, plaintiff also began therapy sessions with clinical social worker Mary-Ann Wildwood. (Tr. 787). Ms. Wildwood provided therapy sessions on five occasions during which time plaintiff experianced an emotional meltdown and had uncontrollable emotional outbursts. (Tr. 782-87, 798). In May 2012, when Dr. Grater retired, plaintiff began seeing advanced practice nurse Alyson Wolz at Dr. Grater's office. (Tr. 887). Ms. Wolz saw plaintiff several times and indicated plaintiff's thought process was tangential and marked by ruminations. (Tr. 938).

### 4. Consultative Examinations

Dr. Adrian Feinerman, M.D., performed a physical consultative examination in October 2011. (Tr. 711-17). Dr. Feinerman noted that plaintiff reported she could walk for one block, stand for twenty minutes, and sit for thirty minutes without problems. (Tr. 712). Plaintiff was taking sixteen different medications at the time of her consultation. (Tr. 712-13). Upon physical examination, plaintiff was able to sit, stand, walk, hear, and speak normally. She was able to lift, carry, and handle objects without difficulty as well. (Tr.

717). Dr. Feinerman concluded that plaintiff's range of motion was diminished in the following areas: cervical flexion thirty degrees, cervical extension to ten degrees, right and left lateral cervical flexion to fifteen degrees, and right and left rotation to thirty-five degrees. (Tr. 719). Dr. Feinerman's diagnostic impressions were fibromyalgia, cervical disc disease, lumbar disc disease, degenerative joint disease, and hypothyroidism. (Tr. 716).

Dr. James Peterson, Ph.D., performed a psychological examination in October 2011. (Tr. 704-08). Dr. Peterson noted that plaintiff saw a psychiatrist once every three months and met with a counselor every week. (Tr. 704). Plaintiff began her exam guarded and defensive but Dr. Peterson stated that eventually plaintiff was more calm and forthcoming. (Tr. 707). Plaintiff could recall six numbers forward and four backwards. Her general fund of knowledge was adequate. Dr. Peterson's diagnoses were major depressive disorder-recurrent, panic disorder with agoraphobia, and generalized anxiety disorder. (Tr. 707).

### 5. RFC Assessments

State agency psychologist Kirk Boyenga, Ph.D. assessed plaintiff's mental RFC in November 2011. (Tr. 735-37). He reviewed medical records but did not examine plaintiff. He felt plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods. (Tr. 735-36). He also opined that plaintiff was moderately limited in her ability to interact appropriately with the general public and respond appropriately to changes in the work setting. (Tr. 736).

Plaintiff had a second mental RFC assessment completed in February 2012 by state agency psychologist Howard Tin, Psy.D. (Tr. 827-29). Dr. Tin found plaintiff to be moderately limited in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within normal tolerances, and work in coordination with or proximity to others without being distracted by them. (Tr. 827). He also opined plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 828).

State agency physician C.A. Gotway, M.D. assessed plaintiff's physical RFC in March 2012. (Tr. 832-38). He reviewed medical records but also did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined plaintiff could stand, walk, or sit for a total of six hours in an eight hour workday. (Tr. 832). She was limited to occasional climbing of ramps and stairs, and occasional balancing, stooping,

kneeling, crouching, and crawling. Additionally, she should never climb ladders, ropes, and scaffolds. (Tr. 833).

### 6. Opinions of Treating Physician

Dr. Grater completed a mental RFC assessment of plaintiff's capabilities in November 2011. (Tr. 742-45). He opined that plaintiff had mild limitations in her ability to sustain an ordinary routine without special supervision, make simple work-related decisions, and ask simple questions or request assistance. (Tr. 743). He felt plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and to set realistic goals or make plans independently of others. (Tr. 743-44).

Dr. Grater opined that plaintiff had marked limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and in her ability to respond appropriately to changes in the work setting. (Tr. 743-44). Finally, Dr. Grater felt plaintiff had extreme limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable

number and length of rest periods, and set realistic goals or make plans independently of others. (Tr. 743-44).

Dr. Grater and Ms. Wildwood submitted an evaluation of Ms. Colgan's mental functional capacity, where they opined plaintiff had moderate limitations in the ability to work in proximity to or coordination with others without being distracted by them and to interact appropriately with the general public. (Tr. 1042). They felt plaintiff had marked limitations in the ability to maintain attention and concentration for extended periods, to accept instructions and to respond appropriately to criticism from supervisors, to get along with coworkers without exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Tr. 1042-43). Finally, they stated she had extreme limitations in the ability to perform activities within a schedule, maintain regular attendance, and to be punctual and to complete a workday or workweek without interruptions by psychologically-based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods. (Tr. 1042).

Dr. Grater and Ms. Wildwood concluded that plaintiff could not function in the workplace due to ongoing psychiatric issues and could not tolerate stressful situations due to her impairments. Plaintiff's symptoms and limitations were further aggravated by chronic pain. (Tr. 1043).

## **Analysis**

Plaintiff contends that the ALJ erred in weighing the medical evidence and in forming the RFC assessment. This Court will begin with plaintiff's arguments regarding the RFC assessment.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." **20 C.F.R. § 404.1545(a)(1)**. In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule. **Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P")**; *Pepper v. Colvin*, **712 F.3d 351, 362 (7th Cir. 2013)**.

In assessing a claimant's RFC, the ALJ must consider *all* of the relevant evidence in the record, and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." **S.S.R. 96-8, at *5, 7**. Additionally, the Seventh Circuit has held that an ALJ's assessment must evaluate "evidence of impairments that are not severe" and "must analyze a claimant's impairments in combination." ***Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012),** *Terry v. Astrue*, **580 F.3d 471, 477 (7th Cir. 2009),** *Craft v. Astrue*, **539 F.3d 668, 676 (7th Cir. 2008).**

Plaintiff first argues that the ALJ failed to appropriately consider plaintiff's deficits in concentration, persistence, or pace. Notably, plaintiff fails

to submit evidence as to how her deficits in concentration, persistence, or pace affect her ability to work. She does not state what limitations were not addressed by the ALJ's RFC assessment or what evidence supports her contention that her deficiencies in concentration, persistence, or pace were not included in the analysis.

The ALJ felt that the restrictions of routine and repetitive tasks as well as simple instructions and simple work related decisions accounted directly for plaintiff's deficits in concentration, persistence, or pace. The ALJ explained that plaintiff's concentration was normal as she was able to read often, complete crossword puzzles, and she had good grades in college after her alleged onset date. (Tr. 21). The ALJ also explained that plaintiff's concentration tested normal with Dr. Grater. (Tr. 30, 839).

Plaintiff cites the Seventh Circuit's recent opinions in **O'Connor-Spinner v. Astrue**, **Yurt v. Colvin**, and **Varga v. Colvin** to support her claim that the RFC's restrictions were not sufficient for plaintiff's deficits in concentration, persistence, or pace. **627 F.3d 614 (7th Cir. 2010); 758 F.3d 850 (7th Cir. 2014); 794 F.3d 809 (7th Cir. 2015).**

In **O'Connor-Spinner**, the Court found that the ALJ needed to orient the VE to all of a claimant's limitations, including deficiencies in concentration, persistence, or pace. The Court stated that there is no per se requirement that the phrase "concentration, persistence and pace" be used in the hypothetical, but it went on to hold that the restriction to simple, repetitive tasks is not an adequate substitute because it "will not necessarily exclude from the VE's

consideration those positions that present significant problems of concentration, persistence and pace." ***O'Connor-Spinner*, 627 F.3d at 620-21.**

In ***Yurt***, the Court stated "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." ***Yurt*, 758 F.3d at 859.** Under ***Yurt*** and ***O'Connor-Spinner***, if a claimant has limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE.

Plaintiff also cites the Seventh Circuit's recent opinion in ***Varga***. **794 F.3d 809 (7th Cir. 2015).** There, the claimant had medical evidence showing she had difficulties in concentration, persistence, or pace and the ALJ's RFC was limited to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few if any work place [sic] changes." ***Id* at 813.** The Court found that the RFC was not sufficient because "[t]here [was] no evidence that the VE in this case reviewed Varga's medical history or heard testimony about the various medical limitations that Varga argues were omitted from the ALJ's hypothetical. Thus, we would expect an adequate hypothetical to include the limitations" relating to concentration, persistence, or pace. ***Id* at 814**.

The cases plaintiff cites differ from the one at hand in one important way. The ALJ here explicitly included the phrase "concentration, persistence, or

pace" within her hypothetical to the VE and within her RFC assessment. In including the phrase "concentration, persistence, or pace" in her hypothetical to the VE she made sure the VE would exclude "positions that present significant problems of concentration, persistence and pace." ***O'Connor-Spinner*, 627 F.3d at 620-21.**

Plaintiff also claims that the ALJ failed to incorporate limitations in her RFC that related to plaintiff's limited range of motion in her spine. Plaintiff's argument on this point is well taken.

The Commissioner argues that the ALJ's thorough analysis of the RFC discussed plaintiff's spinal pain and how it was alleviated after surgery. The Commissioner and the ALJ listed several daily activities that plaintiff was able to perform and that plaintiff had pain relief after her neck surgery. However, plaintiff's argument does not focus on her pain, but rather her cervical range of motion.

Dr. Feinerman's records included an analysis that showed significant limitations regarding plaintiff's cervical range of motion. (Tr. 719). Dr. Feinerman failed to account for these limitations in his discussion of plaintiff's physical capabilities, but that does not diminish the fact that plaintiff's range of motion was objectively severely limited. Plaintiff testified that she preferred not to drive because she could not turn her head to see her blind spots. (Tr. 49). Plaintiff has multiple medical records on file that demonstrate a severely limited range of motion with regard to her cervical spine. (*Ex.*, Tr. 617, 860-65, 906, 933).

The ALJ provided a detailed account of most of plaintiff's medical records and limitations on file. She thoroughly discussed how she arrived at her RFC assessment and her reasoning for the limitations she did and did not include. However, she only once briefly mentions the range of motion limitations while reviewing the medical evidence. (Tr. 27). The ALJ is required to assess all the evidence on file, both medical and nonmedical, and determine an RFC. *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 2005).** As plaintiff notes, the ALJ failed to include a limited range of motion in her hypothetical to the VE and this could have an impact on whether plaintiff could actually perform the available jobs the VE listed. *O'Connor-Spinner*, **627 F.3d 614;** *Yurt*, **758 F.3d 850;** *Varga*, **794 F.3d 809.** This is error.

Finally, plaintiff contends that new medical evidence was added to the record after the state agency consultants issued their opinions and the ALJ should have submitted the new evidence to the consultants for updated opinions. She first states that the ALJ should not have relied upon Dr. Tin's mental RFC assessment because his opinion was issued in January 2012 and plaintiff had records from mental health treatment until June 2012. Plaintiff goes on to list all medical evidence from Ms. Wolz and Dr. Grater during this time. Plaintiff claims that the ALJ was required to submit this additional evidence to another psychological consultant for medical scrutiny. Along these lines, plaintiff then argues that the ALJ erred in relying on the opinion of Dr. Gotway for plaintiff's physical RFC because Dr. Gotway formed his opinion before plaintiff saw Dr. Roumany.

Plaintiff's arguments on these points fail. The Commissioner argues that SSR 96-6p states that ALJs must obtain updated opinions when "additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the state agency medical or psychological consultant's finding." Plaintiff had five treatment sessions with Ms. Wolz after Dr. Tin issued his opinion. These treatment notes indicated plaintiff had sleepiness and trouble focusing, but her mental status examinations were normal and most of her stressors were based on situational problems. (Tr. 25, 887-88, 918-22, 937). It is reasonable to infer that the ALJ was of the opinion that this additional evidence would not render a new opinion from the state agency consultants as it reiterated what plaintiff's record already stated and Dr. Tin reviewed.

Additionally, Dr. Roumany's notes showed plaintiff had myofascial tender points but also that she had normal strength, sensation, gait, and her lab work was normal. (Tr. 27-28, 1033-39). Dr. Roumany did not provide a new diagnosis, or any diagnosis for that matter. Again, it seems that the ALJ's failure to re-contact the state agency consultant in light of this evidence is entirely reasonable.

Most importantly, as the Commissioner notes, the Seventh Circuit has held that when a claimant fails to ask the ALJ to re-contact the state agency consultants, the appropriate inference is that the claimant "decided that another expert opinion would not help her." ***Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010).** If plaintiff felt the ALJ needed

new consultative examinations and RFC assessments after the more recent medical evidence was submitted, she should have requested such from the ALJ. Her failure to request that the ALJ re-contact the consultants does not equate to an error on the part of the ALJ.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Sayon's opinion was well written and took into account most of plaintiff's physical and mental impairments. However, her failure to include limitations regarding plaintiff's extremely limited range of motion in her spine is error and requires remand. ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Elizabeth Colgan's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  June 16, 2016.**

<u>**s/ Clifford J. Proud**</u>

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**